ASARCO INCORPORATED, a New Jersey corporation, Plaintiff,

v.

M.R.H. Holmes A COURT, Weeks Petroleum Ltd., a Bermuda corporation, Bell Resources Ltd., a Western Australia corporation, PRT Records Pty. Ltd., a New South Wales corporation, Associated Broadcasting Development Co. Ltd., a United Kingdom corporation, Associated Communications Corp., a United Kingdom corporation, TVW (U.K.) Ltd., a United Kingdom corporation, Group Color (W.A.) Pty. Ltd., a Western Australia corporation, TVW Enterprises Ltd., a Western Australia corporation, Maranoa Transport Pty. Ltd., a Queensland corporation, Bell Group Ltd., a Western Australia corporation, Heytesbury Securities Pty. Ltd., a Western Australia corporation, and Heytesbury Holdings Ltd., a Western Australia corporation, Defendants.

and

WEEKS PETROLEUM LIMITED, a Bermuda corporation, Defendant-counterclaimant,

v.

ASARCO INCORPORATED, a New Jersey corporation, Plaintiff-counterclaim Defendant,

M.I.M. Holdings Limited, a Queensland, Australia, corporation, Ralph L. Hennebach, Willard C. Butcher, Fletcher L. Byrom, John L. Clendenin, David C. Garfield, Alexander J. Gillespie, Jr., James R. Greene, Harry Holiday, Jr., Louis W. Menk, Michael T. Nelligan, Richard de J. Osborne, Roy Tolk, William L. Wearly, and John Does 1 through 8; Additional Defendants on Counterclaim.

Civ. A. No. 85–1133.

United States District Court, D. New Jersey.

May 6, 1985.

Pitney, Hardin, Kipp & Szuch by Robert P. Hazlehurst, Jr., Morristown, N.J., and Breed, Abbott & Morgan by David S. Patterson, New York City, for plaintiff.

Gelman & McNish by Jill L. McNish, Hackensack, N.J., and Paul, Weiss, Rifkind, Wharton & Garrison by Lewis A. Kaplan, Michael Lampert, Mawrtin Flumenbaum, New York City, for M.R.H. Holmes A Court and Weeks Petroleum.

Sullivan & Cromwell by Richard E. Carlton, New York City, for M.I.M. Holdings Ltd.

Crummy, Del Deo, Dolan, Griffinger & Vecchione by Brian J. McMahon, Newark, N.J., and Davis, Polk & Wardwell by William L. Rosoff, Dennis E. Glazer, New York City, for individual additional counterclaim defendants.

## OPINION

DEBEVOISE, District Judge.

Defendant and counterclaimant Weeks Petroleum Limited, seeks to enjoin preliminarily plaintiff, Asarco, Incorporated, a New Jersey corporation, and its directors from issuing Asarco Series C Preferred Stock declared as a dividend to common stockholders on April 7, 1985.

The pleadings and the procedural history of this case are described in my bench opinion of April 22, 1985. On April 29 a hearing was held on Weeks' application for an order preliminarily enjoining issuance of the Preferred Stock. After the hearing I reserved decision until May 1 at 3:30, and temporarily restrained the issuance of the Preferred Stock until then.

This opinion constitutes my findings of fact and conclusions of law.

### I. *The Facts*

During September 1984 entities controlled by defendant MRH Holmes A Court, including Weeks, began purchasing common stock of Asarco in the open market. Most of this stock was acquired by Weeks, and for simplicity I shall refer to

Weeks as the purchaser of the Asarco stock. Weeks purchased amounts of up to 10,000 shares on most business days from late September through late January 1985. By February 19, 1985, Weeks had acquired 5 percent of Asarco common stock and was required to file a Schedule 13D within 10 days. This it did on February 28. Between February 19 and February 28 Weeks acquired an additional 5 percent of Asarco common stock, bringing its holdings up to almost 10 percent.

Item 4 of Weeks' Schedule 13D stated that the "purpose of the acquisition ... is for investment as part of the general investment portfolio" of Weeks and that Weeks "does not presently intend to seek to acquire control" of Asarco. Eight days after the initial Schedule 13D filing, another member of the Holmes A Court group, Bell Resources Limited, filed a Notification and Report Form under the Hart-Scott-Rodino Antitrust Improvement Act of 1976 seeking approval for the purchase of up to 49.9 percent of Asarco's common stock stating that it was seeking to purchase at least 25 percent of Asarco's outstanding shares. A week later, on March 14, Weeks amended its Schedule 13D to state that it "intends to acquire additional [Asarco] shares" and that "[s]uch purchases could be made with a view toward acquiring control of [Asarco]." On April 7, 1985, the waiting period under the Hart-Scott-Rodino Antitrust Improvement Act of 1976 expired, permitting further purchases of Asarco's common stock by Weeks and other Holmes A Court entities.

Asarco has a 12 member board of directors. Three are members of Asarco management and nine are outside directors, each of whom is actively serving as an officer and/or director of one or more major business corporations. It was the Board's perception that, as characterized in Asarco's brief, "Holmes A Court is no stranger to takeover tactics, unfair to target company shareholders, having engaged in a number of 'creeping' acquisitions, 'greenmail' or low value bust up techniques on target companies to achieve a profit for himself at the expense of the target compa-

ny and its remaining shareholders. By his own admission, Holmes A Court has been involved in an estimated 25 to 30 takeover attempts in recent years." Asarco brief at 7. The Board concluded that Holmes A Court was not a passive investor, that if his prior transactions are any guide, his plans for Asarco would probably not include an offer to all of Asarco shareholders, and that instead he would use his stock position to gain access to the Asarco assets for less than their fair value. The Board therefore further concluded that Holmes A Court represented a threat to the interest of Asarco stockholders and that steps should be taken to repel the threat.

On April 3rd, 1985, Asarco released a proxy statement asking its stockholders to adopt various proposed anti-takeover measures which would create a staggered Board, increase the authorized number of shares of common stock, prohibit stockholder action by written consent and require special approval for certain transactions or for a special meeting of stockholders.

At its March 14th meeting, the Board considered a possible Preferred Stock dividend as a means of preventing a Holmes A Court takeover. On Easter Sunday evening, April 7, the Board convened and further considered the issuance of a Preferred Stock having designated preferences and voting rights. The following day the Holmes A Court interests would again be free to acquire Asarco stock, the Hart-Scott-Rodino Antitrust Improvements Act waiting period having just expired. Faced with that situation, the Board unanimously approved the issuance of the Series C Preferred Stock. The purpose for issuing this stock, as Asarco's Chairman candidly testified, was to prevent Holmes A Court or anyone like him from acquiring a controlling position in Asarco.

A description of the key terms of the new Preferred Stock demonstrates how its issuance would serve to prevent an outside stockholder or group of stockholders from acquiring control of Asarco. When evalu-

ating the effect of the Preferred Stock provisions, it must be recalled that Asarco owns approximately 44 percent of the ordinary shares of the Australian mining corporation, MIM Holdings Limited, and that MIM owns approximately 18 percent of Asarco's common stock. In my April 22 opinion, I held that the New Jersey Business Corporation Act does not forbid MIM to vote those shares.

The dividend to be issued to all common shareholders on April 30, 1985 was one-tenth of a share of Series C Preferred Stock for each share of common stock. Since there are approximately 31.1 million shares of Asarco common stock, Asarco proposed to issue 3.1 million shares of Series C Preferred. The terms of the Series C Preferred are set forth in Asarco's Certificate of Amendment of Restated Certificate of Incorporation filed by the Board. No further corporate authorization was deemed necessary.

According to the amendments adopted by the Board, each one-tenth of a share of Series C Preferred Stock would be entitled to a quarterly dividend of ten cents if any dividend is declared. This dividend has priority over common stock dividends. After both the Series C and the common stock dividends have been paid, each one-tenth of a share of Series C Preferred would participate equally with each full share of common stock in all additional dividends.

The Series C stock is entitled to a liquidation preference of $15 per one-tenth share or $150 per share. (This is nearly six times the current market value of Asarco's common stock). It also carries with it the right to purchase one-seventh of a share of Asarco's common stock, exercisable between April 1 and June 30, 1987 at a cash price of 50 percent of the average market price for Asarco common stock during March of 1987. After three years, Asarco has the option to convert any outstanding shares of Series C into common shares based on their market value. The most extraordinary aspect of the Series C Preferred Stock is its voting rights. Initially, Series C shares possess no voting rights

except on matters affecting the preferential rights of the series. However, if any person or group becomes the "beneficial owner" of more than 20 percent of either Asarco's common stock or its Series C Preferred, then each one-tenth of Series C owned by anyone other than the 20 percent holder would have five votes in all matters submitted to the common stockholders. The Series C shares owned by the 20 percent holder would continue to have no voting rights. | This 20 percent figure, of course, is high enough so that MIM's holdings of Asarco common stock would not or itself trigger the voting provisions of the Series C Preferred Stock. I have not checked through the Series C definitions or the facts relating to MIM ownership to determine whether MIM might be deemed to be an associate or an affiliate of any holder of Asarco stock.

A few examples will illustrate the effects of the voting provisions.

Because any stockholder who acquires 20 percent of the common or Preferred Stock will not be allowed to vote his Preferred Stock, and because the less than 20 percent owners will be able to vote their common stock and will receive 50 votes per share of Preferred Stock held by them, a stockholder who held 20 percent of the common and 20 percent of the Preferred Series C would have only 4.1 percent of the total vote, although he held one-fifth of the stock.

If Weeks acquires 49 percent of the common stock and by virtue of its present holdings of 10 percent of the common stock receives 10 percent of the Series C Preferred Stock as a dividend, then it would have 8.9 percent of the total vote.

A stockholder who held 80 percent of both the common and Series C Preferred which would constitute substantially all of the shares other than those held by Asarco management and MIM—would have only 38.3 percent of the total vote.

The Series C Preferred stock voting provisions effectively block an acquisition not approved by management. As I read the provisions of the original amendment of the Certificate of Incorporation, it would sub-

ject participants in proxy fights to the risk of the loss of relative voting power if the participants obtained proxies for 20 percent of the shares of common stock.

I am informed by Asarco that between the hearing date and the date of this opinion Asarco's Board of Directors authorized a further amendment of the Restated Certificate of Incorporation which explicitly provides that the power to vote shares by reason of the grant of proxies will not trigger the Series C Preferred voting provisions. Weeks contends that through sloppy draftsmanship the amendment fails to achieve this effect. It can at least be said that the Board does not wish to have the 20 percent ownership provision trigger a restructuring of voting power in the proxy situation and presumably at some point it could find language to effect this intent if it has not already done so.

All voting rights of the Preferred Stock can be extinguished by an offer to purchase for cash any and all outstanding shares of Asarco, provided that such offer conforms to certain so-called fair price criteria. A "fair price" with respect to the common stock is defined as the higher or: (i) the highest price paid by the offeror in the past two years, or (ii) a price determined to be fair by a nationally recognized investment banking firm selected by the Asarco Board of directors. A "fair price" with respect to the Preferred Stock would be defined as the higher of: (i) the highest price paid by the offeror in the past two years, or (ii) the liquidation preference of the Preferred Stock plus accrued dividends. These provisions would deter tender offers for less than 100 percent of Asarco's shares and would deter the so-called two tier offer that includes consideration other than cash. In addition, even a cash offeror would be confronted with the necessity of paying $465 million for the Series C Preferred.

Weeks attacks the validity of the issuance of the Series C Preferred Stock on a number of grounds, namely: (i) It conflicts with Article 7 of Asarco's Certificate of Incorporation which cannot be altered without the affirmative vote of four-fifths of Asarco's shareholders; (ii) It is contrary to the Business Corporation Act and the Certificate of Incorporation because a blank check preferred authorized by statute contemplates only the issuance of stock to facilitate corporate financing and because Asarco's stockholders, when adopting the blank check provisions, did not authorize stock issued as a takeover defense; (iii) Asarco's Board may not issue preferred that alters underlying shareholder voting rights; (iv) issuance of the Series C Preferred Stock is not a valid dividend because it discriminates among shareholders of the same class; (v) because the Series C Preferred Stock plan would deter tender offers in proxy contests, any statute authorizing such stock for that purpose would violate the Supremacy and Commerce Clauses of the United States Constitution; (vi) the Board's action would unlawfully manipulate Asarco's corporate machinery and (vii) the issuance of the Series C Preferred Stock violates Asarco's fiduciary duty to all of its stockholders.

## II. *Conclusions of Law*

For the reasons set forth in my April 22, 1985 bench opinion I conclude the Court has jurisdiction.

■ Weeks seeks preliminary injunctive relief. In order to obtain such relief the moving party must demonstrate a reasonable likelihood of eventual success on the merits as well as a probability of irreparable injury if relief is not granted. The trial court must also consider the likely consequences on the parties and the overall public interest. *Freixenet, S.A. v. Admiral Wine & Liquor Co.*, 731 F.2d 148 (3d Cir. 1984).

### A. *Success on the Merits:*

The first factor which must be considered is Weeks' likelihood of success on the merits.

1. *The Business Judgment Rule:* Asarco and its directors defend the issuance of the Series C Preferred Stock on the ground that they have exercised their sound judg-

ment selecting a course of action which they concluded is in the best interests of all the stockholders of Asarco.

Under the business judgment rule, which derives from the fundamental principle that the business and affairs of the corporation are managed by its board of directors, the courts have held that absent evidence of self-dealing, conflict of interest, bad faith or fraud, directors of the corporation will be presumed to have exercised their business judgment in the best interests of the corporation, and the courts will respect their determination. For example, *Papalexiou v. Tower West Condominium*, 167 N.J.Super. 516 (Ch.Div.1979).

Weeks urges that Asarco and its directors cannot claim the benefit of the business judgment rule because all of the directors have an interest of their own at stake. The interest of the three directors from management is obvious—their interest in the retention of their positions and all the emoluments which the positions entail. Weeks urges that even the outside directors have an interest which precludes their reliance on the presumption of the validity of their determinations. They are the holders of significant amounts of common stock, which, since they do not contemplate acquiring a 20 percent interest, will benefit from the voting provisions of the Series C Preferred. Further, the purpose of the issuance of the Series C Preferred is to prevent a takeover. This, according to Weeks, brings this case within the rule of the Third Circuit announced in *Johnson v. Trueblood*, 629 F.2d 287, 289, 292 to 93 (3d Cir.1980), *cert. denied*, 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981). There Judge Seitz, applying Delaware law, stated:

"The business judgment rule ... achieves ... its purpose by postulating that if actions are arguably taken for the benefit of the corporation, then the directors are presumed to have been exercising their sound business judgment rather than responding to any personal motivations....

\*     \*     \*     \*     \*     \*

... [U]nless the plaintiff can tender evidence from which a fact finder might conclude that the defendants' sole or primary motive was to retain control, the presumption of the rule remains.

\*     \*     \*     \*     \*     \*

In short, we believe that under Delaware law, at a minimum plaintiff must make a showing that the sole or primary motive of the defendant was to retain control." 629 F.2d at 292 to 293.

■ The fact that the independent Asarco directors own shares of stock which may be affected by the Series C Preferred and that their likelihood of reelection is enhanced, is not sufficient to deprive their decision of the benefit of the business judgment rule. As Chief Judge Seitz noted in *Johnson v. Trueblood, supra,* unlike an ordinary fiduciary who may not have the slightest conflict of interest, "by the very nature of corporate life a director has a certain amount of self-interest in everything he does." 629 F.2d at 292.

*Moran v. Household International, Inc.,* 490 A.2d 1059 (Del.Ch.1985), appeal pending, seems to me to take a sound position concerning the application of the business judgment rule in the context of antitakeover measures. It distinguished between the situation where a company is "in play" and must respond to a specific takeover bid and the situation where a company perceives a general vulnerability and plans against a takeover with a degree of care. The present case comes somewhere between these two extremes. The potential bidder has been identified but no specific offer has been made. Some planning and deliberation was feasible, but in March and April of 1985 the directors undoubtedly felt the hot breath of Holmes A Court on their backs.

As noted in *Moran,* the business judgment rule is primarily a tool of judicial review. The strength of the presumption may vary from situation to situation and it may vary depending on the procedural context in which it is raised. *Moran* applied

the business judgment rule in the takeover context as follows:

"Despite the nuances which have developed in the decisions applying the business judgment rule in takeover situations, I conclude that the presumption continues to afford protection to directors in pre-planned strategies as well as reactive devices adopted on an *ad hoc* basis and a showing of a 'motive to retain control' is not the equivalent of bad faith sufficient to remove the presumption. *Johnson v. Trueblood, supra* at 293. Where, however, the takeover defensive device is itself calculated to alter the structure of the corporation, apart from the question of motive, and results in a fundamental transfer of the power from one constituency (shareholders) to another (the directors) the business judgment rule will not foreclose inquiry into the directors' action.

"Because the Rights Plan permits the Household Board to act as the prime negotiator for partial tender offers through the power of redemption, the resulting allocation of authority affects the structural relationship between the Board and the shareholders. It is this fundamental result, rather than a mere conflict of interest, which requires the Board to present evidence, the business judgment rule notwithstanding, that its approval of the Plan was not motivated primarily by a desire to retain control but by a reasonable belief that the Plan was necessary to protect the corporation from a perceived threat to corporate policy and effectiveness. *Cheff v. Mathes, supra,* [41 Del.Ch. 494, 199 A.2d 548] at 555 [1964]. Household is not required, however, to demonstrate the intrinsic fairness of the Plan. The *Cheff* standard requires the defendant directors to show that their adoption of the Plan was 'reasonable at the time' (199 A.2d at 555). The burden thus placed may be viewed as the burden of going forward on a showing of reasonableness rather than a burden of persuasion. Because of the protection afforded directors by the business judgment rule the latter burden does not shift and remains with the plaintiffs". At 1076.

■ In the present case the defensive device, the Series C Preferred Stock, is calculated to alter the structure of the corporation, removing decisions in takeover matters from individual stockholders and reposing them in the Board. Thus under *Moran* the directors have the burden of articulating the reasonableness of their plan, but the burden of persuasion remains with Weeks.

Weeks has advanced strong arguments why stockholders would be better off if it were possible for prospective purchasers of Asarco stock to make a variety of tender offers—including two-tiered offers. In support of these arguments Weeks has presented the affidavit of Michael C. Jensen, one of the key witnesses in the *Moran* case. The directors espoused a contrary view, citing past history of Holmes A Court acquisitions and noting their reliance on reputable investment counselors. At this point in the litigation I cannot say that Weeks has overcome the limited protection afforded Asarco and its directors by the business judgment rule insofar as it concerns the decision to take steps which would ensure that a takeover could be carried out only in very limited circumstances.

However, it does not necessarily follow that the particular means which Asarco seeks to pursue to achieve its goals, that is to say, the issuance of a Series C Preferred Stock, is lawful under the provisions of the New Jersey Business Corporation Act.

2. *Validity Under the Corporation Act:*

The starting point for any inquiry concerning the validity of the corporate action is the New Jersey Business Corporation Act, N.J.S.A. 14A:1–1 et seq. The Act, which became effective on January 1, 1969, is to be "Liberally construed and applied to promote its underlying purposes and policies." Its underlying purposes and policies are stated, among others, "(a) to simplify, clarify and modernize the law governing corporations." And "(b) to provide a general corporate form for the conduct of lawful business with such variations and modifications from the form so provided as the

interested parties in any corporation may agree upon, subject only to overriding interests of this state and of third parties." N.J.S.A. 14A:1–1(3).

There was a time when the New Jersey courts limited severely the extent to which legislation could permit directors and stockholders to alter or readjust the rights and powers of stockholders inter sese or to expand the powers of the Board of Directors. This limitation on legislative power, and thus on corporate power, was forcefully espoused in the ancient and now unlamented case of *Zabriskie v. Hackensack and New York Railroad Co.*, 18 N.J.Eq. 178 (Ch.1867). Unanimous stockholder consent was required to effect substantial changes in the corporate structure and relationships, and the Legislature was held powerless to decree otherwise, for to do so would impinge upon the basic contractual rights of stockholders.

This doctrine eroded over the years, and *Zabriskie* was finally laid to rest in *Brundage v. New Jersey Zinc Co.*, 48 N.J. 450, 226 A.2d 585 (1967); see also *A.P. Smith Manufacturing Co. v. Barlow*, 13 N.J. 145, 98 A.2d 581, appeal dismissed, 346 U.S. 861, 74 S.Ct. 107, 98 L.Ed. 373 (1953). After *Brundage* it was clear that under New Jersey law the power which the state had reserved over corporations was a part of a tripartite arrangement between the State, the corporation and its stockholders, permitting the Legislature to expand and modify the powers of corporations as the needs of society or sound corporate governance dictated. The Legislature has wide powers to change and expand the power of corporations. A corporation may exercise fully the powers conferred by the Business Corporation Act, and is in no way inhibited by the rejected principles set forth in *Zabriskie.*

With respect to voting rights of shareholders, N.J.S.A. 14A:5–10 provides that "[e]ach outstanding share shall be entitled to one vote on each matter submitted to a vote at a meeting of shareholders, unless otherwise permitted in the certificate of incorporation." Thus differing voting rights are contemplated.

The power to issue shares is provided for in N.J.S.A. 14A:7–1(1):

> "... Such shares may consist of one class or may be divided into two or more classes and one class may be divided into one or more series. Each class and series may have such designation and such relative voting, dividend, liquidation and other rights, preferences, and limitations as shall be stated in the certificate of incorporation ..."

N.J.S.A. 14A:7–1(2) provides:

> "In particular, and without limitation upon the general power granted by subsection 14A:7–1(1), a corporation, when so authorized in its certificate of incorporation, may issue classes of shares and series of shares of any class ...
>
> \*    \*    \*    \*    \*    \*
>
> "(f) lacking voting rights or having limited voting rights or enjoying special or multiple voting rights."

In the present case Asarco's Board of Directors acted pursuant to N.J.S.A. 14A:7–2 to issue the Series C Preferred Stock. If authorized by the corporation's certification of incorporation, a corporation's board of directors may, under that statutory provision, amend the certification of incorporation to issue new stock and to specify its relative rights, preferences and limitations. Commenting on 14A:7–2 the Commissioners stated:

> "Section 14A:7–2(2), which provides that the certificate of incorporation may authorize the board to act with respect to series, is intended to permit a 'blanket' authorization in general terms. Board action under this subsection does not require the approval of the shareholders or of any series of class of shareholders. See subsection 14A:9–3(3).

The fourth sentence of subsection 14A:7–2(2) makes plain that the board has the power to act under the subsection without regard to the prejudicial effect upon outstanding shares, unless the certifica-

tion of incorporation places an express limitation upon the grant of authority."

Even prior to the effective date of the Business Corporation Act, New Jersey permitted certificates of incorporation to empower boards of directors to issue blank check preferred stock. R.S. 14:8–2, N.J. Laws 1926, c. 318, Section 6, page 534. Acting under the new Act Asarco so empowered its Board in 1970, when Asarco's shareholders amended the certificate of incorporation to create a class of 10 million shares of blank check preferred and to authorize the board of directors to set the terms of that preferred from time to time.

In the proxy statement soliciting approval of blank check preferred, management set forth the following reasons why Asarco's Board needed its new grant of power:

"Your Board of Directors considers that the growing complexity of modern business financing requires greater flexibility in the Company's capital structure than now exists. Under the proposed amendment, the power to issue preferred stock in series would enable the Company to operate more effectively in acquisition negotiations that may develop in the future, since authorization of such stock would permit the issuance at various times of shares specifically adapted to a wide variety of situations. Granting to the Board the authority to set the terms of any series would eliminate the time and expense required for stockholder action on each proposed issuance of preferred stock except where such action is required by law or the rules of any national securities exchange. The Company has no present plans which contemplate the issuance or sale of any preferred stock."

The shareholders were thus informed that the reason for the blank check power was to finance Asarco's corporate acquisitions. They were not informed that the power was to be used to discourage takeover bids. It is reasonable to conclude that at that time management itself did not contemplate using the power to issue preferred stock for that purpose. Another

proposed amendment discussed in the proxy statement called for a super majority of an 80 percent vote by all holders of all classes of Asarco voting stock prior to Asarco effecting a merger, or consolidation with, or sale of assets to any holder of more than 10 percent of any class of stock. With respect to that amendment the proxy statement advised that its purpose and effect was to make more difficult and thereby discourage a takeover attempt which might not be in the best interest of the corporation.

Weeks urges that the Series C Preferred violates New Jersey statutes in two respects. First, the statute permits the issuance of blank check stock only for corporate financing purposes and not to avoid a takeover. Second, the statute does not authorize alteration of voting rights discriminatorily within a class.

The kind of statutes of which N.J.S.A. 14A:7–2 is typical were designed to meet a need for flexibility in securing corporate financing. With rapidly shifting conditions in the securities markets, it was often difficult to float stock the terms of which had to be established by the time consuming procedures of stockholder approval. Thus there was a need to give directors power over the terms of new issues of Preferred Stock on short notice. See 11 W. Fletcher, Encyclopedia of Corporations, Section 5284.1 (1971 rev.).

It is reasonable to conclude that the New Jersey Legislature had this purpose in mind when it enacted Section 7–2 and its predecessors. Since the kind of takeover efforts which are now in vogue were a rarity when the blank check statutes were adopted, it is also reasonable to conclude that the Legislature did not consider one way or the other whether the statutory power could be used to resist takeovers. I do not believe that that is a reason to hold that the power cannot be used for that purpose. The grant of authority is broad. One purpose of the Business Corporation Act was, as previously noted, to permit variations and modifications of corporate forms, and it is to be liberally construed

and applied to achieve its purposes. If blank check preferred stock serves a useful corporate purpose, and if its issuance is within the language of the statute, I see no reason to hold it to be unauthorized merely because the particular purpose was not in the contemplation of the Legislature when it adopted the enabling provisions of the statute.

By analogous reasoning, I do not find that in 1970 when Asarco's Certificate of Incorporation was amended, Asarco's stockholders were led to believe the Board's power to issue stock was to be limited to financing acquisitions or raising capital for other purposes. No one then was thinking of the relationship of preferred stock to takeover situations, but it is reasonable to conclude that all parties to the amendment intended that the amended certificate confer upon the directors a full panoply of powers authorized by N.J.S.A. 14A:7–2.

■ Weeks' other statutory argument, however, is more compelling. By amending its Certificate of Incorporation to provide the Series C Preferred, Asarco's Board created a situation where the same class of stock will have different voting rights. This can be viewed as occurring with respect to two classes of stock. The new preferred will have differing voting rights depending on whether it is held by a 20 percent holder. The new preferred is piggybacked onto the outstanding common stock, and therefore there has also been created a situation in which certain common stockholders—those who acquire 20 percent of the shares—will have their voting power diluted five-fold vis-a-vis the other common stockholders. This is to be distinguished from a situation where a new class of stock has superior voting rights to all common stockholders or to all stockholders holding some other class. I conclude that while the Business Corporation Act permits changes of voting rights as between classes or series of stock, it does not permit an amendment under Section 7–2 which would redistribute voting power within a class or series.

Equality of voting power among stockholders of the same class, or at least among the same series of a class that has more than one series, is a basic concept in corporate law. In *Faunce v. Boost Co.*, 15 N.J.Super. 534, 83 A.2d 649 (Ch.Div.1951) Judge (later Justice) Haneman, noted that "The right to vote is a basic contractual right. It was an incident to membership or of property in the stock, of which the stockholder or member cannot be deprived without his consent." At 539.

The language of the New Jersey statutes clearly suggests that voting rights may be different among different classes or series, but nowhere is it suggested that voting rights may be different within a class or series.

With respect to the original authorization of stock, N.J.S.A. 14A:7–1(1) provides that "Each class in a series may have ... such relative voting ... as shall be stated in the certificate of incorporation...." and Section 7–1(2) provides that "a corporation ... may issue classes of shares and series of shares of any class .. (r) lacking voting rights or having limited voting rights or enjoying special or multiple voting rights."

■ Similarly the provisions of N.J.S.A. 14A:7–2 refer in subsection (1) to the "determination of the relative rights, preferences and limitations of the shares of any class or series." Subsection (2) providing for issuance of stock pursuant to board action refers to "the board's determination of the relative rights and preferences of any class or series." A fair reading of that subsection compels the conclusion that it confers power on the board to alter rights and preferences between different classes of stock. There is no express authority for a board to do what Asarco's Board has sought to do here—namely—change the voting powers of shareholders within a particular class vis-a-vis other members of the same class. The Series C Preferred Stock would have different voting rights within the series, depending upon whether or not a Series C share were held by a 20 percent holder. In light of the piggyback aspect of the issuance of the Preferred Stock the

common stock would have different voting rights depending on presence or absence of 20 percent ownership.

In *Baker v. Providence and Worcester Co.*, 378 A.2d 121 (Del.1977), reversing 364 A.2d 838 (Del.Ch.1976), the Delaware Supreme Court upheld an original corporate charter which limited the voting rights of large shareholders. The Chancery Court had ruled that Section 151(a) of Delaware's corporation law prohibited the creation even in the original certificate of incorporation of a class of stock which has differing voting rights stating:

"[W]ithout question, a reading of Section 151(a) leaves one with the firm conviction that 'classes' may be vested with differing voting rights but that particular shareholders within one class of stock may not. The statute speaks only in terms of 'classes' and unequivocally and repeatedly refers to differentiating only on the grounds of class.

\* \* \* \* \* \*

Thus I am compelled to conclude, after a consideration of both the evolution of Section 151(a) and the language of its provisions, that the divergent voting rights in issue here are not permissible since they are not on a class basis."

I am not persuaded by the logic of the opinion of the Delaware Supreme Court reversing the Chancery Court and do not believe it would be followed in New Jersey.

However, the situation which prevailed in the present case is even more difficult to rationalize. Here the different voting rights among different categories of common stockholders were not contained in the original Certificate of Incorporation. The Board imposed the provision long after the stock was issued and in the hands of shareholders. The case of *Faunce v. Boost Co., supra* was decided when the *Zabriskie* vested rights doctrine still had considerable force. It was written by a judge who later became a member of New Jersey's Supreme Court and who joined in the *Brundage* opinion which concluded that *Zabriskie* has no proper place in modern corporation law.

Nevertheless, I think *Faunce* is useful in the present case. It cannot be cited to support the proposition that the Legislature lacks the power to permit the creation of stock having different voting rights within the same class. It does provide guidance in determining whether in enacting N.J.S.A. 14A:7–2 the Legislature intended to empower a board of directors to amend a certificate of incorporation so as to give some holders of common stock more voting rights than other holders of the same kind of shares or whether to give some holders of preferred stock more voting rights than other holders of the same kind of stock.

In *Faunce* the shareholders by a two-thirds vote approved a plan under which the common stock with voting power was transformed into common stock with no voting power. All voting power was given to a new class of stock which was not entitled to share in the profits of the corporation or the assets on dissolution. The Court stated:

"There is nothing in the statute as it existed at the time the stock was issued that could be read into a contract which would permit the contemplated action ... No specific section of R.S. 14:11–1, N.J. S.A., permits a majority to disenfranchise the minority. Implicit in the original contract was the understanding that each common shareholder would have the right and privilege to a voice in the management and conduct of the affairs of the corporation." 15 N.J.Super. 539, 540, 83 A.2d 649.

It requires little imagination to conjure up situations in which corporate control could be manipulated by readjustment of intra-class voting rights through the mechanism of the issuance by the Board of blank check Preferred Stock. Even granting that in the present case the Board's purposes were to implement sound business objectives, the language of the statute, the potential for abuse of this power and the radical departure from traditional corporate practice which it represents leads

to the conclusion that New Jersey courts would not read this power into the statute. A New Jersey court would probably reach the same result as *Faunce,* but it's rationale would be somewhat different. The conclusion I have reached is supported by the case of *Telvest, Inc. v. Olsen,* Civil Action No. 5798 (Del.Ch. filed March 8, 1979). There the Delaware Chancery Court held the issuance of piggyback preferred to be unlawful under the Delaware general corporation law because it had the effect of altering the relative voting rights of the corporation's common stockholders. In *Telvest,* the directors of Outdoor Sports Industries, Inc. ("OSI"), in an effort to defend against a takeover attempt by Telvest, created, without shareholder approval, a series of preferred stock with an 80 percent class vote on business combinations and other specified transactions with any party owning 20 percent or more of the outstanding voting stock of the company. The OSI certificate of incorporation, like Asarco's, empowered the board of directors to issue preferred stock in series and to designate the stock's characteristics, including its voting powers. The new preferred stock, like Asarco's, was to be issued as a pro rata stock dividend to OSI's existing stockholders.

The Court summarized the transaction as follows:

"As I see it, through the declaration of a purported stock dividend, OSI's board has attempted to convert the voting rights of those same stockholders who would have had the power to approve or disapprove certain business combinations by majority vote—i.e., the holders of the common stock—into the power, in certain situations, to permit less than a majority of the present common stockholders to vote down a merger, sale of assets, etc. when it is being proposed by the owner of 20 percent or more of the outstanding common stock." *Telvest* at 7.

This, of course, is what would happen here if the Series C preferred issued.

The Delaware court then went on to state:

"I say that, in effect, this brings about an alteration of the voting powers of the common stock because the First Series Preferred, being issued in piggyback fashion as a common stock dividend at a one for ten ratio to the common, reflects a proportionate voting power almost identical to that previously held by the owners of the common stock. The difference is that the voting power of a 20 percent or more stockholder who is opposed by OSI's board will not be as strong as it would have been prior to the proportionate issuance of the First Series Preferred as a stock dividend, while the voting powers of the remaining stockholders will become stronger, at least insofar as merger, consolidation, etc., are concerned.

\*   \*   \*   \*   \*   \*

"Thus, I think it is clear that the action taken by the board in creating the First Series Preferred and declaring it as a common stock dividend will, if permitted to stand, alter the previously existing voting rights granted to OSI's common shareholders by OSI's certificate of incorporation." *Telvest* at 8–9.

The Court dismissed OSI's argument that the stock issuance was authorized by Section 151 of the Delaware General Corporation Law, which, like Section 14A:7–2 of the New Jersey Business Corporation Act, permits a board of directors, by resolution, to issue preferred stock and to get voting rights and preferences thereon by resolution if authorized to do so by the company's certificate of incorporation.

The reasoning in *Telvest* is sound and is persuasive in this case. It leads to the conclusion that in adopting the voting provisions of Asarco Series C Preferred Stock, Asarco's Board of Directors exceeded the authority which the New Jersey Business Corporation Act conferred upon them. Thus issuance of the stock would be unlawful.

To summarize my conclusions on the legal issues:

(i) The directors of Asarco do not lose the benefit of the business judgment rule simply because they have decided to make more difficult the efforts of outsiders to take control of the corporation; however, they do have the burden of articulating reasons why their actions are in the best interest of all the stockholders and not motivated primarily to retain present management and control. For the purposes of the preliminary injunction application the directors have met this limited burden and Weeks' proofs do not overcome the presumption of the director's exercise of their business judgment in the best interests of the corporation.

(ii) N.J.S.A. 14A:7-2 authorizes the corporation's Board of Directors to issue Preferred Stock for any lawful purpose, including issuance as part of an otherwise lawful plan to make more difficult the acquisition of a controlling interest in the corporation.

(iii) When Asarco's stockholders approved the amendment of Asarco's Certificate of Incorporation conferring upon its directors the power to issue stock pursuant to N.J.S.A. 14A:7-2, the power conferred was plenary, authorizing the directors to exercise to the full all powers conferred by the statute.

(iv) Neither N.J.S.A. 14A:7-2 nor any other provision of the Business Corporation Act confer upon the corporation or its directors the power to issue classes of shares which have differing voting rights within the same class or which modify previously issued classes of shares so as to confer different voting rights upon shares within that class. Asarco's Series C Preferred Stock has this effect and consequently its issuance would be ultra vires and void.

This leads to the conclusion that Weeks is likely to succeed on the merits of its claim that Asarco's Series C Preferred Stock is unlawful under the New Jersey Business Corporation Act. It is unnecessary to consider Weeks' remaining grounds for a finding of invalidity.

B. *Irreparable injury:* I also conclude that Weeks has established irreparable in-

jury if Series C Preferred Stock is issued. It holds a substantial block of Asarco common stock and evidently plans to acquire in excess of 20 percent of the total common shares outstanding. If it does so, its vote will be illegally diluted by virtue of the new preferred. Weeks' opportunity to make a tender offer will be limited by an unlawful device and correspondingly the opportunity of other shareholders to receive a tender offer will be impaired. All this constitutes irreparable injury. *Applied Digital Data Systems, Inc. v. Milgo Electronic Corp.,* 425 F.Supp. 1145 (S.D.N.Y.1977).

Once the new stock is issued, it will be in the hands of the common stockholders in the first instance, and then undoubtedly large amounts of it will be traded separately from the common. All manner of equities may arise which will make it difficult or impossible to restore the parties to this proceeding to the status quo ante. This too presents a threat of irreparable injury. *Telvest, Inc. v. Olsen, supra.*

C. *Other Equitable Considerations:* Asarco's efforts to prevent Holmes A Court's takeover will be weakened by an order enjoining issuance of a Series C Preferred Stock. I'm not in a position to judge whether such a takeover would benefit or injure Asarco's shareholders in the aggregate. Assuming that such a takeover would be harmful to their interests, it must be imposed by measures which are lawful under New Jersey's corporation law. To allow unlawful measures to be pursued would only ensure that injury of a different kind would be inflicted upon the shareholders and upon Asarco. There would remain the problem of reversing or nullifying an unlawful stock issue. The corporation and perhaps its directors might face liability arising out of the issuance and subsequent transfer of the shares.

The public has an interest in preventing unlawful stock from being circulated in the securities markets and in compliance with the New Jersey Business Corporation Law.

▪ Thus, all the pertinent factors point to the granting of preliminary injunctive

relief. An appropriate order will be entered.