**Augustus CONDUS, et al., Plaintiffs,**

v.

**HOWARD SAVINGS BANK,
et al., Defendants.**

**Civ. A. No. 91–2465.**

United States District Court,
D. New Jersey.

Jan. 6, 1992.

Jared Stamell, Bayonne, N.J., for plaintiffs.

Richard H. Klapper, John B. Reid–Dodick, Sullivan & Cromwell, New York City, Daniel D. Caldwell, Wolff & Samson, Roseland, N.J., for defendants.

## OPINION

WOLIN, District Judge.

Before the Court is defendants' motion to dismiss Counts II and III of plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, defendants' motion will be granted in part and denied in part as to Count III, and will be denied as to Count II.

## BACKGROUND

Plaintiffs Augustus Condus, Christopher D. Harding, John D. Conner, Abram Schmier, Howard Phillips and David N. Oltchick are six former management employees of Howard Savings Bank ("HSB") and its wholly-owned subsidiaries, who worked for HSB after selling their companies to HSB in 1987 in exchange for HSB stock. Condus, Connor and Harding (collectively, "the C & C plaintiffs") owned C & C Insurance Associates, an insurance brokerage business that was acquired by HSB in July 1987. Condus and Connor each received 83,093 shares of HSB stock, and Harding received 13,848 shares. Oltchick, Phillips and Schmier (collectively, "the CAI plaintiffs") owned Consulting Actuaries Incorporated ("CAI"), a company that serviced employee benefit plans. CAI was acquired by HSB in December 1987. In connection with the acquisition, Oltchick and Phillips each received 67,196 of HSB stock, and Schmier received 42,691 shares.

Beginning in 1988, HSB encountered misfortune in connection with its real estate loan portfolio. HSB made several public statements in 1989 that reflected the difficulties it faced due to the downturn in the real estate market. (See Complaint ¶¶ 80–83, 93, 94, 97, 99). In apparent reaction to these public statements, the price of HSB stock declined substantially. On May 4, 1989, HSB stock traded at $22.75 per share. (Complaint ¶ 75). By December 12, 1989, the share price had fallen to $8.125. (Complaint ¶ 101).

Plaintiffs claim in their complaint that as a result of their reliance on misrepresentations made by defendants to plaintiffs in private, plaintiffs retained shares of HSB stock that they otherwise would have sold. (Complaint ¶¶ 49, 62, 74, 122). They additionally allege that, as a result of their reliance on the misrepresentations, they purchased HSB shares that they would not otherwise have purchased. (Complaint ¶¶ 51–53, 65–66, 71, 74, 123). Plaintiffs allege that they had "regular, virtually daily contact" with defendants, who include the chief executive officer, chief financial officer, and president of HSB. (Complaint ¶ 4). The contacts took the forms of personal meetings (Complaint ¶¶ 43, 60), HSB management group meetings, (Complaint ¶¶ 38, 41, 47, 58), special meetings at which top management were present (Complaint ¶ 59), and frequent telephone conversations, (Complaint ¶ 56). Plaintiffs allege that they made "repeated inquiries of top management of [HSB] . . . about the financial condition of [HSB]", because they "were concerned about any developments effecting [sic] the value of [HSB] common stock." (Complaint ¶¶ 39, 42). Defendants' responses to plaintiffs' inquiries allegedly contained "materially misleading information about the true financial condition and prospects of [HSB]." (Complaint ¶¶ 39, 42).

The Court need not detail, for purposes of this motion, the particulars of all alleged misrepresentations. It is sufficient to note the gist of plaintiffs' claims, which is that,

in light of negative public statements made by HSB that cast doubt on the strength and future worth of HSB stock, plaintiffs sought out the advice of HSB management in order to evaluate whether to retain or sell their shares of HSB stock. They claim that the public statements made by HSB led them toward selling their shares. As a result of rosy predictions allegedly made in private to them by defendants—including a prediction as to the price at which HSB stock would be acquired in the "likely" event of an acquisition—plaintiffs retained their stock, as well as purchased additional shares. They contend in Count III of their complaint, entitled "Negligent Misrepresentation", that the representations were false and misleading, were negligently made without the exercise of due care, were justifiably relied on by plaintiffs in retaining their shares and purchasing additional shares, and resulted in financial loss to them. (Complaint ¶ 121–23).

Based on the alleged misrepresentations described above, and other alleged public misrepresentations and fraudulent acts, plaintiffs assert in Count II of their complaint claims of fraud under sections 10(b) and 20(a) of the Securities Exchange Act of 1934.

## DISCUSSION

On a motion to dismiss under Rule 12(b)(6), the Court must accept as true all allegations in the complaint, and provide the plaintiff with the benefit of all inferences which fairly may be drawn from the complaint. *Wilson v. Rackmill*, 878 F.2d 772, 775 (3d Cir.1989). The complaint cannot be dismissed unless the court is certain that no set of facts can be proved that would entitle plaintiff to relief. *Id.; Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

### A. *Motion to Dismiss Count III*

Defendants have moved to dismiss Count III of plaintiffs' complaint for failure to state a claim on which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). They contend that plaintiffs have failed to allege an essential element

of a cause of action for negligent misrepresentation: that the purported misrepresentations were made and relied on pursuant to "a proper business purpose." Defendants assert that plaintiffs cannot establish the "proper purpose" element because the alleged misrepresentations constituted nonpublic "inside" information that plaintiffs had a fiduciary obligation to HSB's shareholders not to utilize. As a matter of law, therefore, defendants claim that they could not have reasonably foreseen that plaintiffs would rely on those statements in making investment decisions.

■ Under New Jersey law, "[a]n incorrect statement, negligently made and justifiably relied upon, may be the basis for recovery of damages for economic loss or injury sustained as a consequence of that reliance." *H. Rosenblum, Inc. v. Adler*, 93 N.J. 324, 334, 461 A.2d 138 (1983). *Rosenblum* dealt with whether a party who provides statements to another as part of a service has a duty to anyone other than those in contractual privity with the party and known third party beneficiaries. *Id.* at 332–33, 461 A.2d 138. The court held that liability could extend to all whose use of and reliance on the information was reasonably foreseeable. *Id.* at 352, 461 A.2d 138.

As a "built-in limit" on the scope of foreseeability, the *Rosenblum* court restricted the class of foreseeable plaintiffs to those who receive the information "pursuant to a proper company purpose", and who rely on the information "in accordance with that purpose." *Id.* at 350, 461 A.2d 138. Thus, in that case, which involved audit statements prepared by an accounting firm for a corporation, liability was restricted to those who legitimately used the statements to make a business decision concerning the corporation. *Id.* at 352–53, 461 A.2d 138. The court stated that liability should not be limited to those in privity because certified financial statements "have become the benchmark for various reasonably foreseeable business purposes." *Id.* at 353, 461 A.2d 138.

In their moving brief, defendants contend that the reference in *Rosenblum* to a plaintiff's use for a "proper company pur-

pose" is an "essential element" of the tort of negligent misrepresentation. Plaintiffs contend in their opposing brief that use for a "proper business purpose" is not an essential element of the cause of action, but rather states one way in which to distinguish foreseeable reliance from unforeseeable reliance on a given statement. In their reply brief, defendants' seem to agree with this position, by stating that "[a] corporate officer cannot 'fairly expect to be held responsible' for fellow employees' insider trading losses allegedly resulting from misstatements that he or she makes to those employees during day-to-day exchanges." (Reply Brief at 3).

The Court agrees with this assessment of the "proper business purpose" language in the New Jersey cases. No duty to exercise due care runs from the maker of an incorrect statement to those relying on the statement for an "improper" purpose. Courts recognize the potentially limitless liability inherent in allowing recovery of purely economic loss based on reliance on incorrect statements. Accordingly, in negligent misrepresentation cases that do not involve physical harm, the concepts of foreseeability and duty are construed somewhat narrowly.[1] 2 F. Harper, F. James, & O. Gray, The Law of Torts § 7.6 at 403–04 (1986). One way that New Jersey has limited that duty is by restricting reliance to "proper business purposes." This restriction merely serves as one means to narrow liability for statements negligently made, by excluding "improper" uses of representations as a basis for liability. Although this restriction may appear to artificially constrain intuitive notions of foreseeability, the concept of foreseeability is not given uncritical application in tort actions for purely economic loss based on negligent conduct. Rather, courts are "required to

draw upon notions of fairness, common sense and morality to fix the line limiting liability as a matter of public policy." *People Express Airlines, Inc. v. Consolidated Rail Corp.*, 100 N.J. 246, 264, 495 A.2d 107 (1985). Under New Jersey law, that line has been fixed in negligent misrepresentation cases between "proper" and "improper" uses of alleged misrepresentations. The latter are unforeseeable to their maker as a matter of public policy and as a matter of law.[2]

To use the facts of *Rosenblum* for example, reliance on a certified audit statement to make decisions whether to invest in the audited corporation, or to determine whether to extend credit to that corporation, would be "proper business purposes" which are foreseeable to the accountants. In contrast, the accountants would not be liable for their misrepresentations if the audit statement is relied on to further an illegal purpose, and incorrect figures in the statement prevent a successful gain from the illegal conduct.

To resolve this motion, the Court must accept as true the allegations in plaintiffs' complaint and determine whether, if proved, plaintiffs' reliance on the alleged misrepresentations would entitle them to relief.

Defendants contend that plaintiffs' retention of stock and purchase of new shares in reliance on alleged misrepresentations were, as a matter of law, unforeseeable "improper purposes", because they constituted illegal uses of the inside information. According to defendants, plaintiffs, on receiving non-public information that indicated a favorable economic forecast for HSB, were under a fiduciary obligation not to use that information to their advantage. To support their theory, defendants cite to

---

**1.** Thus, plaintiffs' citation to *Katko v. Briney,* 183 N.W.2d 657 (Iowa 1971) (burglar guilty of larceny entitled to seek compensatory damages for injury resulting from spring gun) for the proposition that the common law places no requirement on a plaintiff that he have acted properly to recover damages is inapposite. *Katko* involved serious physical harm, not pure economic loss. Courts have traditionally been less solicitous of tort claims to recover for economic loss than for physical injury. For a gen-

eral discussion of this traditional distinction and reluctance to expand liability, see *People Express Airlines, Inc. v. Consolidated Rail Corp.,* 100 N.J. 246, 495 A.2d 107 (1985).

**2.** Whether makers of intentional, as opposed to negligent, misrepresentations would be given the benefit of this distinction under New Jersey law is a question this Court need not decide.

*In re Orfa Secur. Litigation,* 654 F.Supp. 1449 (D.N.J.1987), and *National Westminster Bancorp v. Leone,* 702 F.Supp. 1132, 1139 (D.N.J.1988). Those cases hold under New Jersey common law that a corporate director may not use "inside" information for personal gain. *Orfa,* 654 F.Supp. at 1456. Plaintiffs allege that they legitimately sought out information from defendants because, in light of unfavorable public disclosures by HSB regarding its financial condition, they were concerned about the worth of their HSB stock. (Complaint ¶¶ 39, 42).

### 1. Retention of Stock

 It would have been perfectly legal for plaintiffs to have sold their HSB stock in reaction to the public statements made by HSB, as that decision would not have been based on "inside" information. Assuming that the information obtained from defendants on which plaintiffs base Count III of their complaint was "inside information", there was also no legal bar to plaintiffs retaining their stock based on the favorable content of that information.

As the name for the well-known federal securities law offense itself indicates, prohibited "insider *trading* " consists of the use of "inside" information in connection with "trades"—purchases or sales—of securities. *Dirks v. S.E.C.,* 463 U.S. 646, 654, 103 S.Ct. 3255, 3261, 77 L.Ed.2d 911 (1983); 15 U.S.C. § 78j(b) (Section 10(b) of the Securities and Exchange Act of 1934, from which "insider trading" offense arises, prohibits frauds "in connection with the purchase or sale" of securities). That theory of liability "imposes on insiders a duty to disclose information which need not otherwise be disclosed *before they act on that information in any uninformed marketplace." Deutschman v. Beneficial Corp.,* 841 F.2d 502, 506 (3d Cir.1988), *cert. denied,* 490 U.S. 1114, 109 S.Ct. 3176, 104 L.Ed.2d 1037 (1989) (emphasis added).

Similarly, this Court concludes that there is no proscription under New Jersey law against an "insider" relying on favorable "inside" information in making the decision to retain stock. Defendants argue that the mere decision by plaintiffs to retain their holdings in HSB stock, in reliance on defendants' representations, was improper.

Once an insider learns of material nonpublic information, he or she cannot thereafter purge himself or herself of that information. The logical implication of defendants' argument is that once a corporate insider learns of nonpublic information that could influence him or her to retain personal holdings of the corporation's stock, to avoid violating a fiduciary duty, he or she must: (1) sell the personal holdings; or (2) disclose the information to the public. The Court can find no basis under New Jersey law to support this result.

#### a. *selling of stock*

By the nature of their positions, corporate managers and directors deal daily in nonpublic information concerning the corporation by which they are employed. It is also common if not prevalent for such insiders to own shares of the corporation's stock. To require corporate insiders to sell their personal holdings whenever in the course of their employment they learn of material information favorable to the corporation would result in a *de facto* prohibition against corporate manager or director ownership of corporate stock. Such a result would ignore the realities of corporate law.

To the extent defendants would have the Court draw a distinction between inside information "properly" obtained by the insider and that which is "improperly" obtained, the Court believes that such a rule would be entirely unworkable, even if it were desirable. As an example, plaintiffs in this case, who managed subsidiaries of HSB, could properly be told of almost any information that related materially to the financial condition of HSB. To attempt to determine the purposes for which inside information has been obtained by insiders and the uses to which the information has been put could prove to be an elusive and often illusory task. What of information that is legitimately obtained and used, but additionally plays a part, conscious or unconscious, in the insider's personal investment decision?

That plaintiffs allegedly sought out the information in issue solely for purposes of determining their own investment strategies does not significantly alter the balance of concerns. It might well be in a corporation's best interest to have management retain their investments in the corporation in the face of bad news about the corporation, to instill investor confidence and to ensure the managers' commitment to the success of the corporation. Provided that they are not also buying shares of the corporation on the basis of the positive inside information, they violate no duty to anyone.

b. *disclosure of inside information*

Similarly, to require an insider to disclose the material information would be equally unwise and unprecedented. Information can be among a corporation's most valuable assets. *See United States v. Chestman,* 947 F.2d 551, 576–78 & n. 5 (2d Cir.1991) (en banc) (Winter, J., concurring in part and dissenting in part). To require indiscriminate disclosure whenever a corporate insider learns of favorable material information would often not be in the corporation's best interest. *Id.* Therefore, the Court does not believe that New Jersey law imposes such a requirement.

A further problem is presented by the federal prohibition against trading in stock on the basis of inside information. Although selling a stock to *prevent* making a profit (as opposed to doing so for the purpose of making a profit) may perhaps fall outside the bounds of the prohibition, it may not always be clear whether the inside information at issue militates for or against retaining the stock. Under defendants' theory, if the insider was in doubt as to the information, he would best sell his stock to comply with state fiduciary standards, and disclose the information prior to the sale to comply with federal standards. Such a result would be absurd.

In a legal context different from that presented by this case, Judge Debevoise of this District recognized that a corporate director's ownership of corporate stock does not automatically create a conflict of interest every time he makes a corporate decision that has implications for his personal investments. *Asarco, Inc. v. Court,* 611 F.Supp. 468, 473 (D.N.J.1985). Quoting Judge Seitz of the Third Circuit Court of Appeals, Judge Debevoise stated that "by the very nature of corporate life a director has a certain amount of self-interest in everything he does." *Id.* (quoting *Johnson v. Trueblood,* 629 F.2d 287, 292 (3d Cir.1980)).

So too is it that the potential conflict presented by a corporate insider's decision to retain corporate stock on the basis of inside information should not be viewed as *per se* improper. By the very nature of the corporate world, corporate insiders will often both own corporate stock and deal daily in nonpublic information that may have some bearing on their decisions to retain the stock. The Court can find no basis under New Jersey law for imposing a fiduciary duty on corporate insiders to sell their stock or disclose the nonpublic information whenever it may affect their decisions to retain corporate stock. Therefore, as to plaintiffs' claim with respect to the retention of shares of HSB stock in reliance on the misrepresentations of defendants, defendants' contention that this claim must be dismissed because it fails to allege a "proper business purpose" must be rejected.

### 2. Purchases of New Shares

Plaintiffs also claim that, in reliance on the alleged misrepresentations, they each purchased additional shares of HSB stock. Defendants claim that the facts alleged in the complaint to support this claim constitute insider trading as a matter of law, an improper purpose that may not be the basis for a cause of action for negligent misrepresentation.

As explained above, under New Jersey law, the maker of a statement has no duty to persons who rely on the statements as the basis for their improper or illegal acts. As a matter of law, such uses of information are held unforeseeable to the provider of the information. The law thus presumes that a person who provides information will expect that the recipient will use the infor-

mation only for proper purposes. If plaintiffs allege that they engaged in insider trading based on the representations of defendants, they fail to state a cause of action for negligent misrepresentations.

The complaint alleges that "as management of a Howard subsidiary, each plaintiff was in regular, virtually daily contact with defendants." (Complaint ¶ 4). As alleged in the complaint, the individual defendants held some of the highest executive positions within HSB. (Complaint ¶¶ 20–23). Plaintiffs allege that, as part of their employment responsibilities, they "had regular reporting obligations to Howard's top management", and "regularly attended meetings at Howard's corporate headquarters" so that defendants could "inform plaintiffs about the current operations of the Howard organization." (Complaint ¶¶ 38, 41). They also allege that they possessed no "access to non public financial or operational information about the Bank *except as represented to them by the defendants.*" (Complaint ¶ 38) (emphasis added).

In paragraph 39, plaintiffs state that "they made repeated inquiries of top management of Howard, including defendants ... about the financial condition and prospects of Howard." (Complaint ¶¶ 39, 42). Plaintiffs also allege that they discussed with defendants "Howard's financial performance and stock price." (Complaint ¶ 45). They allegedly were told about the "high likelihood" of HSB being "acquired at a substantial profit to shareholders." (Complaint ¶ 49; see also ¶ 61).

Further, plaintiffs allege that they "monitored public statements and press releases" during the relevant period, "virtually on a daily basis." (Complaint ¶ 72). Yet plaintiffs allege that their reliance on the representations of defendants "was reasonable because the statements [were] made by Howard's top management who had and represented that they had, the true information on the financial and business condition of Howard *which plaintiffs did not have.*" (Complaint ¶ 51) (emphasis added). In reliance on these nonpublic representations, plaintiffs purchased additional shares of HSB stock. (Complaint ¶¶ 52, 53, 66).

Plaintiffs fail to state a claim of negligent misrepresentation in connection with the purchase of additional shares of HSB stock. Their assertion in opposition to this motion that the misrepresentations alleged in the complaint in support of Count III were neither nonpublic nor material is refuted by clear language in the complaint. Plaintiffs' assertion that they were not corporate insiders is equally devoid of merit.

A fact is material under the securities laws "if there is a substantial likelihood that a reasonable shareholder would consider it important" in making an investment decision. *Basic, Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988). There can be no doubt that HSB management's private assessment of the financial condition and prospects of HSB would be considered important by investors when, as plaintiffs allege, that information was contrary to public knowledge. (See Complaint ¶ 51). That plaintiffs purchased additional shares solely on the strength of this information bears silent witness to its materiality.

The allegations in plaintiffs' complaint also demonstrate clearly that plaintiffs had a fiduciary duty to refrain from trading in HSB stock on the basis of the inside information they obtained from defendants. The complaint states that plaintiffs' access to defendants arose from their positions as managers of wholly-owned subsidiaries of HSB, who reported to and received reports from HSB management as part of their job responsibilities. Few corporate relationships are more "inside" than were plaintiffs'. *See Chiarella v. United States,* 445 U.S. 222, 228, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980) (noting existence of "relationship of trust and confidence between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation").

Had the alleged misrepresentations proved true, there can be no doubt that plaintiffs purchases of stock could have subjected them to insider trading liability. To the extent Count III of plaintiffs' complaint alleges the purchases of additional

shares of HSB stock as a basis for their claim of negligent misrepresentation, it fails to state a cause of action, and will be dismissed.

### B. *Motion to Dismiss Count II*

■ Defendants contend that plaintiffs' second cause of action, which alleges violations of the federal securities laws, should be dismissed because it fails to allege facts sufficient to establish that the claims are not time-barred. Plaintiffs claim that the timeliness of their action is implicit from the allegations of the complaint, but have requested leave to amend their complaint to expressly allege such facts.

■ No party disputes that plaintiffs' securities claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 are governed by 15 U.S.C. § 77m (§ 13 of the Securities Act of 1933), which provides that such claims must be brought within one year of their discovery but in no event later than three years after the alleged violations. *See Lampf, Pleva, Lipkind, et al. v. Gilbertson,* —— U.S. ——, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) (holding that § 13 applies to § 10(b) actions); *Zola v. Gordon,* 685 F.Supp. 354, 371 (S.D.N.Y.1988) (statute of limitations for § 20(a) claim is same as for § 10(b) claim when control liability is predicated on violation of § 10(b)).[3] To the extent § 13 is a statute of repose and not a statute of limitations, its requirements are elements of a cause of action and must be plead.

It is clear that plaintiffs' claims do not fall outside the outer limit of three years

imposed by the statute, as plaintiffs allege that the wrongful conduct underlying the securities laws claims occurred no earlier than April 1989. (Complaint ¶ 7). In light of plaintiffs' offer to amend their complaint to allege facts sufficient to satisfy the one year "discovery" provision of § 13, the Court need not decide whether such facts must be plead as elements of the cause of action. *See Short v. Belleville Shoe Mfg. Co.,* 908 F.2d 1385, 1391 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991) (describing three year requirement of § 13 as being in the nature of a statute of repose, and one year discovery requirement as being in the nature of a statute of limitation). The Court will deny defendants motion as to this count, and will grant leave to plaintiffs to amend their complaint to remove any doubt that the action is timely.

■ Defendants further argue that, if the plaintiffs rely on the class certification in the consolidated actions pending before this Court in *Gutman v. Howard Savings Bank,* Civil Action No. 89–5131,[4] to have tolled the statute of limitations on their action, plaintiffs must opt out of that class action before they may pursue their federal securities laws claims in this action.[5] Plaintiffs have acknowledged in their opposing papers that they do indeed rely on the class certification to have tolled the statute of limitations on their claims, (Opposing Brief at 12), but have not addressed defendants' contention that they must opt out of that action.[6]

3. Pending federal legislation that would limit the retroactivity of *Lampf,* if enacted into law, would have no affect on this case, as it would merely require application of the law as it existed on the day before *Lampf* was decided. In *In re Data Access System Secur. Litigation,* 843 F.2d 1537 (3d Cir.) *cert. denied sub nom.,* 488 U.S. 849, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988), the Third Circuit adopted the same limitations period adopted by the Supreme Court in *Lampf.* Hence, under the proposed law, *Data Access* would apply in this circuit.

4. For background on the *Gutman* litigation, see *Gutman v. Howard Savings Bank,* 748 F.Supp. 254 (D.N.J.1990).

5. Plaintiffs served their complaint more than nineteen months after the last alleged misrepresentation and more than one year after this Court entered an order certifying the *Gutman* class action. Therefore, unless the class certification tolled the limitations period for plaintiffs' federal securities law causes of action, those claims would be untimely because filed more than one year after their discovery of facts sufficient to apprise them of the potential causes of action.

6. The class certification tolling rule was established by the Supreme Court in *Crown, Cork & Seal Co. v. Parker,* 462 U.S. 345, 353, 103 S.Ct. 2392, 2397, 76 L.Ed.2d 628 (1983).

The Court agrees with defendants that because plaintiffs rely on the class certification in *Gutman* to have tolled the statute of limitations on their federal securities law claims, they must opt out of that class action before proceeding independently. If plaintiffs claim that they are class members in the *Gutman* action—which by necessity they must claim if they seek the benefit of the limitations period tolling, *see e.g., Applebaum v. State Farm Mut. Automobile Ins. Co.*, 626 F.Supp. 1299, 1304 (M.D.Pa.), *aff'd*, 806 F.2d 251 (3d Cir.1986) (table)—they will be bound by decisions in that action unless they expressly reserve their rights not to be bound by opting out. The Court will not allow plaintiffs to seek adjudication of identical rights in two different actions. Therefore, plaintiffs must either voluntarily dismiss Count II of their complaint, or must opt out of the class action.

### CONCLUSION

For the reasons stated above, the Court will deny defendants' motion to dismiss Count III to the extent that it alleges retention of stock in reliance on negligent misrepresentations, and will grant defendants' motion to the extent Count III alleges the purchase of stock based on negligent misrepresentations. Defendants' motion to dismiss Count II of plaintiffs' complaint will be denied. Plaintiffs will be granted leave to amend their complaint to allege facts demonstrating the timeliness of their action. Plaintiffs will be ordered to either opt out of the *Gutman* consolidated class action, or to voluntarily dismiss Count II of their complaint.