First Citizens BancShares, Inc. v. KS Bancorp, Inc., 2018 NCBC 23.

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 2022

FIRST CITIZENS BANCSHARES,
INC.,

            Plaintiff,

    v.

KS BANCORP, INC.; and its
individual directors, HAROLD T.
KEEN; JAMES C. PARKER;
GORDON C. WOODRUFF; R.
EDWARD SCOTT, JR.; SIDNEY E.
SAULS; B. KENNETH JONES, II;
APRIL S. CULVER; LISA H.
BROGDON; and EARL W. WORLEY,
JR.,

            Defendants.

**ORDER ON MOTION FOR
PRELIMINARY INJUNCTION**

THIS MATTER comes before the Court on Plaintiff First Citizens BancShares, Inc.'s Motion for Preliminary Injunction ("PI Motion"; ECF No. 7).

THE COURT, having considered the PI Motion, the briefs in support of and in opposition to the PI Motion, the affidavits and other supporting documents filed by the Parties, and the arguments of counsel at the hearing, concludes that the PI Motion should be GRANTED for the reasons set forth below.

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, LLP by Carl N. Patterson, Donald H. Tucker, Christopher G. Smith, and Jang H. Jo for Plaintiff First Citizens BancShares, Inc.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, LLP by Jennifer K. Van Zant, Reid L. Phillips, and Daniel L. Colston for Defendant KS Bancorp, Inc.*

*Bell, Davis & Pitt, PA by Alan M. Ruley, Kevin G. Williams and Michael D. Phillips for Defendants Harold T. Keen, James C. Parker, Gordon C. Woodruff, R. Edward Scott, Jr., Sidney E. Sauls, B. Kenneth Jones, II, April S. Culver, Lisa H. Brogdon, and Earl W. Worley, Jr.*

McGuire, Judge.

## FACTS AND PROCEDURAL BACKGROUND

1. The Court makes the following findings of fact solely for purposes of deciding the PI Motion. These findings are not binding on the Court in later proceedings in this action. *E.g.*, *Lohrmann v. Iredell Mem'l Hosp., Inc.*, 174 N.C. App. 63, 75, 620 S.E.2d 258, 265 (2005) ("It is well settled that findings of fact made during a preliminary injunction proceeding are not binding upon a court at a trial on the merits.").

2. Plaintiff First Citizens BancShares, Inc. ("Plaintiff") is a Delaware corporation with its principal place of business in Wake County, North Carolina. (Verified Compl., ECF No. 3 at ¶ 21.)

3. Defendant KS Bancorp, Inc. ("KS Bancorp") is a North Carolina corporation with its principal place of business in Johnston County, North Carolina. (*Id.* at ¶ 22.) KS Bancorp is a small, regional bank with nine locations in eastern North Carolina. At all times relevant to this matter, KS Bancorp had 1,309,001 shares of common stock outstanding. (Harold T. Keen Aff., ECF No. 25, Attach. C at ¶ 6.) KS Bancorp is a privately owned corporation whose common stock is generally traded on the Pink® Open Market. Plaintiff currently owns nearly 9% of the outstanding shares of KS Bancorp. (ECF No. 3 at ¶ 1.)

4. Defendant Harold T. Keen ("Keen") is the President and Chief Executive Officer of KS Bancorp. The other individual Defendants are officers and directors of KS Bancorp. (*Id.* at ¶¶ 24–31; KS Bancorp and the individual Defendants are

collectively referred to as "Defendants".) Keen and his family members own over 13% of KS Bancorp's common stock. (ECF No. 25, Attach. C at ¶ 7.) Plaintiff alleges that KS Bancorp's Board members, executives, and senior leadership own approximately 20% of KS Bancorp's outstanding common stock. (ECF No. 3 at ¶ 9.)

5. KS Bancorp's charter provides that any "Business Combination," such as a merger or acquisition, requires the "affirmative vote of the holders of seventy-five percent (75%) or more of the outstanding Voting Shares, voting separately as a class" or the "affirmative vote of at least seventy-five percent (75%) of the Whole Board of Directors." (ECF No. 3, Ex. 2 at §§ 7.1(a), 7.2.) Plaintiff alleges that these change of control provisions and "the composition of [KS Bancorp's] ownership . . . make any change of control event virtually impossible without the approval of [KS Bancorp's] existing board of directors." (ECF No. 3 at ¶ 39.)

6. In or around spring of 2017, KS Bancorp's Board of Directors (the "KS Board") approved a plan to convert KS Bancorp into a Subchapter S corporation (the "Sub S Plan"). (*Id.* at ¶ 40.) The Sub S Plan would have required KS Bancorp to buy out many of its shareholders, including its institutional shareholders. (*Id.* at ¶ 41.) At the time the KS Board approved the Sub S Plan, KS Bancorp's common stock was trading at approximately $19 to $24 per share. (*Id.* at ¶ 42.)

7. After learning of the plan to convert KS Bancorp to a Subchapter S corporation, on June 30, 2017, Plaintiff made an unsolicited Indication of Interest to KS Bancorp expressing its desire to merge with KS Bancorp. (ECF No. 25, Ex. 2.) Plaintiff proposed to purchase additional shares of KS Bancorp at $33 per share. The

Indication of Interest was "non-binding" and expired on July 14, 2017. (*Id.*) Plaintiff alleges that KS Bancorp intended to purchase shares under the Sub S Plan "at a price materially less than $33 per share." (ECF No. 3 at ¶ 42.) KS Bancorp apparently did not notify its shareholders about Plaintiff's Indication of Interest.

8.   On July 11, 2017, the KS Board rejected the Indication of Interest in a letter from Keen to Plaintiff. (ECF No. 3 at 44; ECF No. 3, Ex 3.) The letter stated that after a full review, the KS Board had determined that "the Board's recently-adopted strategy of reorganizing as an S corporation [was] more beneficial to the KS shareholders than the strategy of accepting the unsolicited Indication of Interest." (*Id.*)

9.   On July 13, 2017, Plaintiff provided KS Bancorp with a second Indication of Interest, increasing the purchase offer to $35 per share in cash and/or preferred stock. (ECF No. 25, Ex. 2.) Plaintiff also publicly announced the proposal in a press release in order to alert KS Bancorp's shareholders of the offer. (ECF No. 3 at ¶ 46.) The KS Board engaged an investment banking firm and conducted an analysis of the Indications of Interest. (ECF No. 25, Attach. C at ¶ 9.) On September 11, 2017, the KS Board unanimously rejected the Indications of Interest, resolving that the "continued independent operation of KS is in the best interest of its shareholders." (*Id.*)

10.   On October 25, 2017, the KS Board announced that it had withdrawn its plan to pursue its Sub S Plan. (ECF No. 3 at ¶ 49; ECF No. 3, Ex. 5.)

11.     On December 19, 2017, Plaintiff obtained approval from the Federal Reserve to purchase up to 80% of KS Bancorp's outstanding common stock.[1] (ECF No. 3 at ¶¶ 52–54; ECF No. 25, Ex. 4.)  The period to acquire these shares was set to expire on March 19, 2018, but can be extended at the discretion of the Federal Reserve through December 19, 2018.  (*Id.* at ¶ 54.)

12.     On January 30, 2018, Plaintiff began contacting KS Bancorp's shareholders, offering to purchase their shares at $35 per share in cash.  (William O. Galloway Aff., ECF No. 9, Ex. 2 at ¶ 3.)  Several shareholders expressed interest in selling their shares to Plaintiff at the price of $35 per share.  By February 9, 2018, Plaintiff had purchased an additional 52,300 shares of KS Bancorp common stock at $35 per share.  (*Id.* at ¶ 6.)

13.     In early February 2018, the KS Board met to consider Plaintiff's actions. (ECF No. 25, Attach. C at ¶ 14.)  On February 7, 2018, the KS Board adopted a "Shareholder Rights Plan" (sometimes referred to as a "poison pill").  (*Id.* at ¶ 15.) The KS Board also declared a dividend of one "right" for each share of common stock. (*Id.* at ¶ 17.)  The Shareholder Rights Plan provides that if a party (an "Acquiring Person") acquires beneficial ownership of 15% or more of KS Bancorp's common stock, the KS Board may, in its sole discretion, activate the rights.  (ECF No. 3 at ¶ 57.)  In that event, the Rights Plan would, *inter alia*, permit all shareholders to purchase additional shares of KS Bancorp's common stock at 50% of the then current per share

---

[1] Plaintiff applied to the Federal Reserve pursuant to 12 CFR § 225.11(c), which requires that a bank holding company submit an application to the Federal Reserve in order to acquire the securities of an additional bank or bank holding company.  12 CFR § 225.11(c) (2018); ECF No. 25, Ex. 3.

market price, subject to the right of KS Bancorp to exchange all or part of the outstanding rights for shares of KS Bancorp common stock, at an exchange ratio of one share of common stock per right. (*Id.*) The Shareholder Rights Plan, however, provides that upon activation of the plan, an Acquiring Person's rights "shall become null and void" and an Acquiring Person has no rights to purchase or acquire shares of common stock under the Shareholder Rights Plan. (*Id.*; ECF No. 3, Ex. 8 at § 8(e).)

14. Defendants claim the Shareholder Rights Plan "was intended to reassure [KS Bancorp's] employees and clients, protect the value of [KS Bancorp's] business, strengthen the [KS] Board's negotiating leverage with potential acquirers, and provide adequate time to evaluate whether alternatives other than continued independent operations or [Plaintiff's] Indications of Interest would be in the best interests of [KS Bancorp] and its shareholders." (ECF No. 25, Attach. C at ¶ 16.) Plaintiff contends that "the effect of the [Shareholder] Rights Plan is to further empower [KS Bancorp's management and the KS Board] and to protect them from change of control events to ensure that they remain in place" and that the plan "prevent[s] KS [Bancorp's] shareholders from receiving . . . a superior price for their KS [Bancorp] common stock." (ECF No. 3 at ¶ 60.)

15. On February 9, 2018, KS Bancorp announced the adoption of the Shareholder Rights Plan in a press release. (ECF No. 3 at ¶ 56; ECF No. 3, Ex. 7.) In conjunction with the Shareholder Rights Plan, KS Bancorp announced a Share Repurchase Program in which the corporation would repurchase up to an aggregate of $2.75 million of KS Bancorp's outstanding common stock "at management's

discretion [and] at prices management considers attractive." (ECF No. 3, Ex. 7.) Plaintiff contends the Share Repurchase Program will have the effect of further entrenching the KS Bancorp's management and the KS Board. (*Id.* at ¶¶ 63–64.)

16. Upon learning about the adoption of the Shareholder Rights Plan, Plaintiff ceased its efforts to acquire additional KS Bancorp stock in order to avoid triggering the Rights Plan. (*Id.* at ¶ 59.) At the time it ceased purchasing shares, Plaintiff had acquired 52,300 additional shares of KS Bancorp's common stock; was in the process of finalizing additional purchases of 110,499 shares; and was in contact with other shareholders owning 86,678 shares. (ECF No. 9, Ex. 2 at ¶¶ 6–8.)

17. On February 15, 2018, Plaintiff filed its Verified Complaint. In its Verified Complaint, Plaintiff alleges claims for declaratory judgment, seeking a declaration that the Shareholder Rights Plan is unlawful under North Carolina law pursuant to N.C. Gen. Stat. §§ 55-6-01(a) and 55-6-24(b) (hereinafter, "G.S.") (ECF No. 3 at ¶¶ 68–72) and breach of fiduciary duty (*id.* at ¶¶ 77–83). Plaintiff also seeks a preliminary and permanent injunction (*id.* at ¶¶ 73–76).

18. On February 15, 2018, Plaintiff also filed the PI Motion with an accompanying brief and affidavits. (ECF Nos. 7–9.)

19. On February 16, 2018, this matter was designated a mandatory complex business case by the Chief Justice of the North Carolina Supreme Court and was assigned to the undersigned by the Chief Judge of the North Carolina Business Court. (ECF Nos. 1 and 2.)

20.     Plaintiff filed additional affidavits on February 26, 2018 and March 1, 2018. (ECF Nos. 17 and 22.)  On March 7, 2018, Defendants filed a brief in opposition to the PI Motion along with several exhibits and affidavits (ECF Nos. 24 and 25),[2] and on March 9, 2018, Plaintiff filed a reply brief (ECF No. 27).  On March 12, 2018, the Court held a hearing on the PI Motion.   The PI Motion is now ripe for determination.

## ANALYSIS

21.     A preliminary injunction may be issued during litigation when "it appears by affidavit that a party thereto is doing or threatens or is about to do . . . some act . . . in violation of the rights of another party to the litigation respecting the subject of the action, and tending to render the judgment ineffectual."  G.S. § 1-485(2). A preliminary injunction is "an extraordinary remedy and will not be lightly granted." *Travenol Labs., Inc. v. Turner*, 30 N.C. App. 686, 692, 228 S.E.2d 478, 483 (1976). The movant bears the burden of establishing the right to a preliminary injunction. *Pruitt v. Williams*, 288 N.C. 368, 372, 218 S.E.2d 348, 351 (1975).

22.     To obtain a preliminary injunction, a movant must show "a likelihood of success on the merits of his case and . . . [that the movant] is likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the protection of his rights during the course of litigation." *Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 466, 579 S.E.2d 449, 452 (2003);

---

[2] Plaintiff submitted at the hearing and subsequently filed various objections to Defendants' Affidavits (ECF No. 28).  To the extent these objections constitute a motion to strike, the Court denies the motion.

*accord Looney v. Wilson*, 97 N.C. App. 304, 307–08, 388 S.E.2d 142, 144–45 (1990). Likelihood of success means a "reasonable likelihood." *See A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 404, 302 S.E.2d. 754, 761 (1983).

23. The issuance of an injunction is "a matter of discretion to be exercised by the hearing judge after a careful balancing of the equities." *State ex rel. Edmisten v. Fayetteville St. Christian Sch.*, 299 N.C. 351, 357, 261 S.E.2d 908, 913 (1980). A preliminary injunction "should not be granted where there is a serious question as to the right of the defendant to engage in the activity and to forbid the defendant to do so, pending the final determination of the matter, would cause the defendant greater damage than the plaintiff would sustain from the continuance of the activity while the litigation is pending." *Bd. of Provincial Elders v. Jones*, 273 N.C. 174, 182, 159 S.E.2d 545, 551–52 (1968); *accord Cty. of Johnston v. City of Wilson*, 136 N.C. App 775, 780, 525 S.E.2d 826, 829–30 (2000) (noting that a court should weigh "the advantages and disadvantages to the parties" in deciding whether to issue a preliminary injunction).

A. *Standing*

24. Preliminarily, Defendants challenge Plaintiff's standing to bring this action. (Mem. Law Opp. Pl.'s Mot. Prelim. Inj., ECF No. 24 at pp. 12–14.) Defendants, however, focus their standing argument solely on Plaintiff's claim for breach of fiduciary duty. Defendants contend that the breach of fiduciary duty claim belongs to KS Bancorp and must be pursued derivatively or pursuant to one of the two exceptions recognized under *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 658,

488 S.E.2d 215, 219 (1997) (describing the two exceptions as "(1) where there is a special duty, such as a contractual duty, between the wrongdoer and the shareholder, and (2) where the shareholder suffered an injury separate and distinct from that suffered by other shareholders"). Plaintiff, however, is not arguing its likelihood of success on its fiduciary duty claim. It argues only the merits of its claim for a declaratory judgment that KS Bancorp's adoption of the Rights Plan was unlawful under the North Carolina Business Corporation Act, G.S. §§ 55-1-01 et seq. ("NCBCA").

25.     Plaintiff contends that it has standing to pursue an injunction because the KS Board's adoption of the Shareholder Rights Plan was *ultra vires*, and that it has standing under G.S. § 55-3-04. Section 55-3-04, entitled "Ultra vires," provides in pertinent part that a "corporation's power to act may be challenged . . . [i]n a proceeding by a shareholder against the corporation to enjoin the act." G.S. § 55-3-04(b)(1); *see also Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390, 397, 537 S.E.2d 248, 254 (2000) (recognizing that a shareholder may bring an individual claim "to enjoin an ultra vires act by the corporation"); 1-3 *Robinson on North Carolina Corporation Law* § 3.06 (2017) (Section 55-3-04(b)(1) "permits a shareholder to raise the claim of ultra vires in a proceeding to enjoin the act."). The Court concludes that G.S. § 55-3-04(b)(1) gives Plaintiff, as a shareholder of KS Bancorp, standing to bring suit to enjoin an allegedly *ultra vires* act of KS Bancorp at this stage in the litigation.[3]

---

[3] The Court does not decide here whether Plaintiff will have standing to pursue other claims in the future under this statute.

B.     *Likelihood of Success on the Merits*

26.     In support of its Motion, Plaintiff argues only the merits of its claim for a declaratory judgment that KS Bancorp's Shareholder Rights Plan is void under the NCBCA.  Accordingly, the Court will consider only that claim in determining Plaintiff's likelihood of success on the merits.

27.     Plaintiff argues that the Shareholder Rights Plan violates the NCBCA because KS Bancorp is not a public corporation and under the NCBCA only public corporations may enact poison pill plans that discriminate against shares of the same class.  Defendants contend that the NCBCA permits all corporations, public or private, to enact poison pills.  Defendants further contend that the NCBCA only prohibits discrimination between shares, not between shareholders, and the KS Bancorp Shareholder Rights Plan only treats *shareholders* of its common stock, and not the shares, differently.

28.     Plaintiff seeks a declaration that the KS Board's adoption of the Shareholder Rights Plan is unlawful pursuant to G.S. §§ 55-6-01(a) and 55-6-24(b) because KS Bancorp is not a "public corporation" authorized to adopt a poison pill plan under the statutes.  (ECF No. 3 at ¶¶ 68–72.)  Section 55-6-01(a) of the NCBCA provides, in pertinent part, as follows:

> The articles of incorporation must prescribe the classes of shares and the number of shares of each class that the corporation is authorized to issue.  If more than one class of shares is authorized, the articles of incorporation must prescribe a distinguishing designation for each class, and, prior to the issuance of shares of a class, the preferences, limitations, and relative rights of that class must be described in the articles of incorporation.  *All shares of a*

*class must have preferences, limitations, and relative rights identical with those of other shares of the same class unless the articles of incorporation divide a class into series.*

(Emphasis added.) KS Bancorp's Charter provides for two classes of shares: common and preferred. (ECF No. 3 at Ex. 2, p. 1.) The common stock is not divided into series. Prior to the KS Board's adoption of the Shareholder Rights Plan, all shares of KS Bancorp's common stock had the same preferences, limitations, and rights. (*See id.*)

29. Section 55-6-24 of the NCBCA provides as follows:

(a)    A corporation may issue rights, options, or warrants for the purchase of shares of the corporation. The board of directors, or officers of the corporation who are designated by the board of directors pursuant to G.S. 55-6-21(a), shall determine the terms upon which the rights, options, or warrants are issued, their form and content, and the consideration for which the shares are to be issued.

(b)    In the case of a public corporation, the terms and conditions of such rights, options or warrants may include, without limitation, restrictions or conditions that preclude or limit the exercise, transfer or receipt of such rights, options or warrants by the holder or holders or beneficial owner or owners of a specified number or percentage of the outstanding voting shares of such public corporation or by any transferee of any such holder or owner, or that invalidate or void such rights, options or warrants held by any such holder or owner or by such transferee. Determinations by the board of directors whether to impose, enforce, waive or otherwise render ineffective any such restrictions or conditions may be judicially reviewed in an appropriate proceeding.

30. A public corporation is defined as "any corporation that has a class of shares registered under Section 12 of the Securities Exchange Act of 1934, as amended." G.S. § 55-1-40(18a). KS Bancorp is not a "public corporation" under the

NCBCA because it does not have any shares registered under Section 12 of the Securities Exchange Act of 1934. (ECF No. 3 at ¶ 34; ECF No. 3, Ex. 1.)

31. The Court must interpret the statutory language at issue to determine whether a non-public corporation, like KS Bancorp, is authorized to adopt a poison pill plan. The Supreme Court of North Carolina recently summarized the basic principles used by our courts when interpreting the language in a statute as follows:

> Questions of statutory interpretation are ultimately questions of law for the courts . . . . The principal goal of statutory construction is to accomplish the legislative intent. The best indicia of that intent are the language of the statute, the spirit of the act and what the act seeks to accomplish. The process of construing a statutory provision must begin with an examination of the relevant statutory language. It is well settled that where the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must construe the statute using its plain meaning. In other words, if the statutory language is clear and unambiguous, the court eschews statutory construction in favor of giving the words their plain and definite meaning.

*Wilkie v. City of Boiling Spring Lakes*, No. 44PA17, 2018 N.C. LEXIS 67, *13–14 (Mar. 2, 2018) (citations and quotations omitted); *see also N.C. Dep't of Corr. v. N.C. Med. Bd.*, 363 N.C. 189, 201, 675 S.E.2d 641, 649 (2009) ("When the language of a statute is clear and without ambiguity, it is the duty of this Court to give effect to the plain meaning of the statute, and judicial construction of legislative intent is not required. However, when the language of a statute is ambiguous, this Court will determine the purpose of the statute and the intent of the legislature in its enactment.").

32. "Usually, words of a statute will be given their natural, approved, and recognized meaning." *Wilkie*, 2018 N.C. LEXIS 67, at \*17. "Courts should give effect to the words actually used in a statute and should neither delete words used nor insert words not used in the relevant statutory language during the statutory construction process." *Midrex Techs. v. N.C. Dep't of Revenue*, 369 N.C. 250, 258, 794 S.E.2d 785, 792 (2016) (citations and quotations omitted). The court should "give every word of the statute effect, presuming that the legislature carefully chose each word used." *N.C. Dep't of Corr.*, 363 N.C. at 201, 675 S.E.2d at 649.

33. Applying these principles, the Court concludes that the plain meaning of the relevant statutes cited above, when read together, is that only public corporations as defined by the NCBCA are authorized to adopt poison pill shareholder plans that "preclude or limit," "invalidate or void," or otherwise discriminate between the rights attached to shares within the same class of stock. *See* G.S. § 55-6-24. In other words, Section 55-6-24, permitting public corporations to discriminate between the rights attached to shares within the same class of stock, functions as an exception to the general rule in Section 55-6-01(a) that "[a]ll shares of a class must have preferences, limitations, and relative rights identical with those of other shares of the same class" unless divided into series.

34. Nevertheless, even if the Court were to conclude that there were ambiguity in the statutory language, the available information regarding the General Assembly's intent behind the statutes supports the same interpretation. The NCBCA was amended in 1989 to add Section 55-6-24 in response to court decisions from other

jurisdictions holding that poison pill plans violated statutes, such as Section 55-6-01(a), that required that all shares of the same class have the same rights and restrictions. The North Carolina Commentary to the amended Section 55-6-24 provides:

> Subsection (b) contains special provisions that do not appear in either the prior law or the Model Act and are designed to eliminate uncertainty as to the validity of certain rights plans created by companies with a class of securities registered under the Securities Exchange Act of 1934. . . . Specifically, the rights plans typically used as defenses to hostile takeovers (called "poison pills") create purchase or conversion rights that are not exercisable in the hands of a hostile bidder. Without explicit statutory language to the contrary, for example, such a discriminatory feature might be held to violate the requirement of G.S. 55-6-01 that all shares of the same class have the same rights . . . . The drafters were of that (*sic*) view that rights plans should not be generally prohibited. Several states, including New York, Pennsylvania, Ohio, Wisconsin and Hawaii, have adopted explicit validating language similar to that included in this section.

G.S. § 55-6-24 cmt.

35. The Commentary strongly supports the conclusion that in enacting Section 55-6-24(b), the General Assembly was concerned with providing publicly traded North Carolina corporations the ability to adopt poison pill plans in the face of an attempted hostile takeover bid. *See Parsons v. Jefferson-Pilot Corp.*, 333 N.C. 420, 425, 426 S.E.2d 685, 689 (1993) ("[T]he commentary to a statutory provision can be helpful in some cases in discerning legislative intent.").

36. Defendants contend that Section 55-6-24(b) merely "sought to clarify that rights plans would not violate other provisions of the North Carolina Business

Corporation Act" and "does not address whether private corporations may adopt such plans." (ECF No. 24 at p. 20.) Defendants argue that the 1989 amendment to the statute did not reference non-public corporations because poison pills were rarely used by private, closely-held corporations at that time, so there was "no need" for the legislature to address private corporations. (*Id.* at pp. 21–22.) The Court is not persuaded by this argument. It conflicts with two tenets of statutory construction: (1) *expressio unius est exclusio alterius*, the expression of one thing is the exclusion of another, *Baker v. Martin*, 330 N.C. 331, 337, 410 S.E.2d 887, 890–91 (1991); and (2) that every word of a statute should be given effect, *N.C. Dep't of Corr.*, 363 N.C. at 201, 675 S.E.2d at 649. The use of the term "public corporation" in Section 55-6-24(b) must be interpreted to mean that private corporations were excluded from its provisions, and the term would be superfluous in the statute if the General Assembly actually intended to include *all* corporations.

37.    In addition, in response to the court decisions invalidating poison pill plans, some states amended their corporation acts to authorize all corporations, public or private, to adopt poison pill shareholders' rights plans, *see, e.g.*, Ariz. Rev. Stat. § 10-624(C); Colo. Rev. Stat. § 7-106-205(3); Ga. Code Ann. § 14-2-624(c), while others passed amendments permitting only public corporations, or public corporations with a minimum number of shareholders, to adopt such plans, *see, e.g.*, N.Y. Bus. Corp. Law § 505(a)(2) (only public corporations); S.C. Code Ann. § 33-6-240(B) (only public corporations); Idaho Code §§ 30-1701(11) and 30-1706(1) (only public corporations with 50 or more shareholders); S.D. Codified Laws §§ 47-33-3(n)

and 47-33-5 (only public corporations with 50 or more shareholders). There is no reason to believe that the North Carolina General Assembly did not bring the same considerations to bear as the legislatures in these other states in deciding to adopt Section 55-6-24 and limit authority to adopt poison pill plans to public corporations.

38. Defendants also argue that Section 55-6-01(a) only requires that shares, and not shareholders, be treated identically, and that under the Shareholder Rights Plan only shareholders are treated differently. The Court is not persuaded by this argument. Other provisions of the NCBCA support the notion that shares cannot be practically separated from shareholders' rights arising out of those shares. For example, Section 55-11-01 provides that boards of directors may adopt and shareholders may approve a "plan of merger" for merger of one corporation into another. The statute further provides, in relevant part, that "[t]he plan of merger must set forth: . . . (3) The manner and basis of converting the shares of each corporation into shares, obligations, or other securities of the surviving or any other corporation or into cash or other property in whole or part." G.S. § 55-11-01(b). In the North Carolina Commentary to Section 55-11-01, the legislature noted that the drafters believed that, with the exception of public corporations under Section 55-6-24(b), the current law of North Carolina "does not permit discrimination among the *holders of shares of a single class* in the kind of property that can be received in a merger; all the shares of a single class must be treated the same, both in value and kind." G.S. § 55-11-01 cmt. (emphasis added).

39.     In addition, following amendment, the current Model Business Corporation Act explicitly permits shareholders to be treated differently.  (Model Business Corporation Act, ECF No. 27, Ex. 1 at § 6.01(e) ("Any of the terms of shares may vary among holders of the same class or series so long as such variations are expressly set forth in the articles of incorporation.").)  Section 6.01(e) of the Model Business Corporation Act was revised in 2001 to "allow for variations among [share]holders, so long as the terms are stated in the articles of incorporation," and this revision post-dates the 1989 revision of the NCBCA.  (Model Business Corporation Act § 6.01 cmt.)  The NCBCA has not been amended following the Model Business Corporation Act amendment to follow the revised Model Business Corporation Act in that respect, suggesting that the legislature did not intend for Section 55-6-01(a) to mean that only shares, but not shareholders, be treated identically.

40.     The Court recognizes that there is case law from other jurisdictions supporting the proposition that anti-discrimination provisions such as the one in the NCBCA only require that shares, and not shareholders, be treated identically.  *See, e.g., Dynamics Corp. of Am. v. CTS Corp.*, 637 F. Supp. 406, 408 (N.D. Ill. 1986); *Neuberger Berman Real Estate Income Fund, Inc. v. Brown Trust No. 1B*, 342 F. Supp. 2d 371, 374–75 (D. Md. 2004).  However, the Court finds it difficult to divorce the rights that a shareholder possesses in his or her shares from the rights inherent in the shares themselves.  *See Farrish-Stafford Co. v. Charlotte Cotton Mills*, 157 N.C. 188, 189–90, 72 S.E. 973, 974 (1911) ("It is elementary that a corporation as a rule

must treat all shareholders of the same class alike."); 1-19 *Robinson on North Carolina Corporation Law* § 19.04 n.6 (2017) (noting that the provision requiring all shares in the same series to have identical rights was moved to Section 55-6-01(a) "with modifications not intended to change" the rule described in *Farrish-Stafford Co.*). Absent any specific guidance on the issue from the NCBCA's statutory language, commentary, or legislative history, the Court declines at this stage of the litigation and based on the record currently before it to interpret Section 55-6-01(a) as permitting shareholders of the same class of shares to be treated differently based on the number of shares they hold.

41. Because KS Bancorp is not a public corporation under the NCBCA, it is not permitted to enact a Shareholder Rights Plan that discriminates between the rights attached to shares of stock within the same class. Accordingly, Plaintiff has demonstrated a likelihood of success on the merits of its claim for declaratory judgment.

C. *Irreparable Harm and Balancing the Equities*

42. The question of whether Plaintiff will suffer irreparable harm if this Court does not issue the injunction is much more difficult. Plaintiff contends that it will be irreparably injured if the injunction is not issued because it will lose the opportunity to purchase up to 80% of KS Bancorp's common stock under the Federal Reserve's current approval.[4] (Mem. Law Supp. Mot. Prelim. Inj., ECF No. 8 at pp.

---

[4] That approval expires on March 19, 2018. At the hearing, however, Plaintiff's counsel stated that Plaintiff will seek an extension of the March 19, 2018 deadline. As noted above (¶ 11), at Plaintiff's request, the Federal Reserve may extend the deadline until December 19, 2018.

15–18.) Plaintiff argues that it will lose both "the opportunity to increase its ownership of shares of [KS Bancorp]'s common stock, and all the rights attendant with those shares." (*Id.* at p. 18.) Plaintiff asserts that its loss is irreparable because there currently are "willing shareholders who want to sell" their shares to Plaintiff, and there is a "limited market for [KS Bancorp's] shares and a limited window of time" for Plaintiff to purchase those shares. (Reply Mem. Law Supp. Mot. Prelim. Inj., ECF No. 27 at p. 10.)

43. Defendants argue that Plaintiff's "alleged injury is speculative and remote" because the Federal Reserve could extend Plaintiff's approval to purchase KS Bancorp's shares, and it is unlikely that Plaintiff would be able to acquire 80% of KS Bancorp's stock. (ECF No. 24 at pp. 8–9.)

44. In its reply, Plaintiff makes the additional argument that it, and KS Bancorp's other shareholders, are being subjected to per se irreparable injury because the Shareholder Rights Plan is unlawful and *ultra vires*. In support of its argument, Plaintiff relies on *Asarco, Inc. v. Court*, 611 F. Supp. 468 (D.N.J. 1985). In *Asarco*, defendant Weeks Petroleum, Inc. ("Weeks") began acquiring plaintiff Asarco, Inc.'s ("Asarco") stock with the intent of gaining control of Asarco. *Id.* at 469–70. Asarco's board of directors concluded that Weeks' acquisition of control would not be in its shareholders' best interest. *Id.* at 470. In response, the board approved the issuance of Series C Preferred Stock to prevent Weeks or other outside investors from acquiring a controlling stake in Asarco. *Id.* Asarco intended to issue, as a dividend to shareholders, one-tenth of a share of Series C Preferred Stock for each share of

common stock held by the shareholder. *Id.* at 471. The Series C Preferred Stock carried with it certain rights and privileges, including "if any person or group becomes the 'beneficial owner' of more than 20 percent of either Asarco's common stock or its Series C Preferred, then each one-tenth of Series C owned by anyone other than the 20 percent holder would have five votes in all matters submitted to the common stockholders. The Series C shares owned by the 20 percent holder would . . . have no voting rights." *Id.*

45.    Weeks moved to preliminarily enjoin Asarco and its board of directors from issuing the Series C Preferred Stock, contending, *inter alia*, that it violated the New Jersey Business Corporation Act because the Act prohibited a corporation from issuing a class of shares having different voting rights. *Id.* at 472. The district court agreed with Weeks, holding:

> [I]n adopting the voting provisions of Asarco Series C Preferred Stock, Asarco's Board of Directors exceeded the authority which the New Jersey Business Corporation Act conferred upon them. Thus issuance of the stock would be unlawful. . . .
>
> Neither N.J.S.A. 14A:7-2 nor any other provision of the Business Corporation Act confer upon the corporation or its directors the power to issue classes of shares which have differing voting rights within the same class or which modify previously issued classes of shares so as to confer different voting rights upon shares within that class. Asarco's Series C Preferred Stock has this effect and consequently its issuance would be ultra vires and void.

*Id.* at 479–80.

46.    In *Asarco*, the district court also held that:

> Weeks has established irreparable injury if Series C Preferred Stock is issued. It holds a substantial block of Asarco common stock and evidently plans to acquire in excess of 20 percent of the total common shares outstanding. If it does so, its vote will be illegally diluted by virtue of the new preferred. Weeks' opportunity to make a tender offer will be limited by an unlawful device and correspondingly the opportunity of other shareholders to receive a tender offer will be impaired. All this constitutes irreparable injury.
>
> Once the new stock is issued, it will be in the hands of the common stockholders in the first instance, and then undoubtedly large amounts of it will be traded separately from the common. All manner of equities may arise which will make it difficult or impossible to restore the parties to this proceeding to the status quo ante. This too presents a threat of irreparable injury.

*Id.* at 480 (citations omitted).

47. Finally, in balancing the equities, the district court in *Asarco* opined that permitting Weeks to acquire a controlling interest in Asarco might well cause harm to the corporation and its shareholders, but "to allow" the board of directors' "unlawful measures" to be employed in defense of a hostile takeover "would only ensure that injury of a different kind would be inflicted upon the shareholders and upon Asarco." *Id.*

48. While the Court finds that the *Asarco* court did not hold that the board of directors' *ultra vires* approval of the Series C Preferred Stock caused per se irreparable harm to the plaintiff, its holding is supportive of Plaintiff's claim that it will suffer irreparable injury in this case if the KS Bancorp poison pill plan is not enjoined. As in *Asarco*, if KS Bancorp is not required to terminate, or is prohibited from taking action under, the Shareholder Rights plan, then Plaintiff's acquisition of

15% of the common stock will likely cause its ownership stake to be significantly diluted by "an illegal device," and other shareholders' opportunity to receive an offer of purchase from Plaintiff "will be impaired." *Id.* at 480. If Plaintiff then ultimately prevailed in this lawsuit it would be extraordinarily difficult, if not impossible, to restore it to its prior position or to calculate an amount of damages that would compensate for its injuries. The Court concludes that under the circumstances present in this case, the injury to Plaintiff's rights would be irreparable.

49. Finally, the balancing of the equities also favors Plaintiff, albeit narrowly. Although Defendants may have a legitimate interest in maintaining KS Bancorp as an independent business and in representing its shareholders in the event of attempted hostile takeover of the corporation, the use of the unlawful mechanism of a poison pill plan to do so effectively negates Defendants' right to assert any equities inherent in that interest. In addition, as Plaintiff contends, KS Bancorp's Articles of Incorporation already contain provisions providing certain protections from a hostile takeover or merger. The Articles of Incorporation require approval from the holders of 75% of the outstanding voting shares or 75% of the KS Board before any business combination can be approved. (Stipulation, ECF No. 26, Ex. A at § 7.2.) If the injunction issues, Defendants are not without a defensive mechanism to attempt to prevent a hostile takeover.

50. Because the Court finds that: (1) Plaintiff has a likelihood of success on the merits of its declaratory judgment claim, (2) Plaintiff will suffer irreparable harm

if an injunction does not issue, and (3) the balancing of the equities favors Plaintiff, the Court concludes that the Motion should be GRANTED.

THEREFORE, IT IS ORDERED that:

51. Plaintiff's Motion for Preliminary Injunction is GRANTED; and Defendants are IMMEDIATELY ENJOINED and PROHIBITED from taking any action under the Shareholder Rights Plan or from adopting any similar "poison pill" plans while this litigation is pending.

52. On or before 5:00 p.m. on April 4, 2018, Plaintiff shall post a bond of $25,000 with, and in a form satisfactory to, the Clerk of Superior Court of Wake County. If Plaintiff fails to post the required bond by 5:00 p.m. on April 4, 2018, the injunction shall dissolve immediately.

SO ORDERED, this the 21st day of March, 2018.

/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge for
Complex Business Cases